UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CARLOS ALFREDO MARTINEZ,

Petitioner,

v.

EMILY FRANCES MARTINEZ,

Respondent.

CASE NO. 2:25-cv-01375-TL

ORDER ON PETITION FOR
RETURN OF CHILD

This matter is before the Court on Petitioner Carlos Alfredo Martinez's Verified Petition for Return of Child to Japan under the Convention on the Civil Aspects of International Child Abduction. Dkt. No. 1. Petitioner seeks the return of his child, E.M.M., to Japan. *See id.* ¶ 6. Petitioner alleges that Respondent Emily Frances Martinez, E.M.M.'s mother, wrongfully removed E.M.M. from Japan to the jurisdiction of this Court in May 2025. *Id.* ¶ 1. Respondent denies that Japan was the habitual residence of E.M.M. (Dkt. No. 29 ¶ 122) and argues that she feared a grave risk of danger to herself and E.M.M. had they remained in Japan (*id.* at 9). Having considered the pleadings (Dkt. Nos. 1, 29), the evidence and testimony presented at the

ORDER ON PETITION FOR RETURN OF CHILD – 1

evidentiary hearing (*see* Dkt. Nos. 65, 69), the Parties' Stipulated Proposed Findings of Fact and Stipulated Logistics of the Child's Return to Japan (Dkt. No. 84), Petitioner's amended Proposed Findings of Fact and Conclusions of Law (Dkt. No. 86-1), Respondent's proposed Findings of Fact and Conclusions of Law (Dkt. No. 84-2), the Parties' supplemental briefing (Dkt. Nos. 88, 89), and briefing on Petitioner's Motion to Correct the Record (Dkt. No. 90), the Court DENIES the Petition.

## I.    PROCEDURAL BACKGROUND

On July 22, 2025, Petitioner filed his verified petition. Dkt. No. 1. Beginning on January 27, 2026, the Court held a two-day evidentiary hearing on the Petition. Dkt. Nos. 65, 69. At the hearing, the Court heard testimony from: Petitioner; Respondent; Landon Poppleton, PhD, JD (Respondent's expert); Sahoko Awakawa[1] Kono, Attorney (Respondent's expert); Sarah W. Boss, LMHC (Respondent's therapist); and Peter J. Favaro, PhD (Petitioner's rebuttal expert). The Parties also entered various exhibits into evidence.

After the hearing, the Parties submitted Stipulated Proposed Findings of Fact and Conclusions of Law (Dkt. No. 84), as well as their non-stipulated proposed findings of fact and conclusions of law. Upon reviewing the Parties' post-hearing briefing, the Court requested supplemental briefing on two issues: (1) whether Petitioner's stipulated custody rights were breached under Japanese law; and (2) the significance (or not) of Sahoko Awakawa's testimony regarding how custody is awarded under Japanese law to parents who are separated. Dkt. No. 87 (order requesting supplemental briefing) at 3. The Parties submitted supplemental briefing as

---

[1] Awakawa is the expert's professional name; Kono is her registered name. Ex. R-9 at 1; Dkt. No. 73 at 201:21–202:11. As she was testifying in her professional capacity, the Court will refer to the expert by her professional name.

directed. *See* Dkt. Nos. 88 (Petitioner's Supplemental Brief), 89 (Respondent's Supplemental Brief).[2]

## II.    LEGAL FRAMEWORK

The Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, is a multilateral international treaty on parental kidnapping that seeks to "secure the prompt return of children wrongfully removed or retained in any Contracting State," Hague Convention, art. 1., and "to ensure that parents cannot gain 'tactical advantages' in child custody proceedings by absconding with a child to a more favorable forum' or by otherwise undermining custody decrees entered in the country of the child's habitual residence." *Colchester v. Lazaro*, 16 F.4th 712, 717 (9th Cir. 2021) (quoting *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004)). The Convention provides "a 'provisional' remedy that fixes the forum for custody proceedings." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (citation omitted).

The United States and Japan are signatories to the Convention. *Status Table*, HCCH (Hague Conference on Private International Law), https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 [https://perma.cc/2ZU3-2WMK]. Congress has implemented the Convention domestically by enacting the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.* ICARA grants federal district courts concurrent jurisdiction with state courts over petitions arising under the

---

[2] In Respondent's Supplemental Brief, Respondent alleged that Stipulated Fact No. 11 in the Parties' joint submission (*see* Dkt. No. 84 at 3) included the words "under Japanese Law," which were not part of the stipulation presented to her. Dkt. No. 89 at 2. Respondent anticipated that Petitioner might try to argue that Respondent had stipulated to the element of breach. *See id.* For his part, Petitioner filed a Motion to Correct the Record asserting that, in fact, the language had been included in the draft that Respondent sent to Petitioner, and that Petitioner was not asserting that Respondent had stipulated to breach. Dkt. No. 90 at 2. Ultimately, the Court determines that Petitioner did have rights of custody under Japanese law. *See infra* Section V.C.1. The only relevance of the Motion to Correct the Record to this Order is Petitioner's acknowledgment that he was not asserting that Respondent had stipulated that she had breached his rights of custody.

ORDER ON PETITION FOR RETURN OF CHILD – 3

Convention that seek return of children wrongfully removed or retained. *Id.* § 9003(a). ICARA further provides that courts are "to determine only rights under the Convention and not the merits of any underlying child custody claims." *Id.* § 9001(b)(4). Therefore, "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." Convention art. 19; *see also Colchester*, 16 F.4th at 717 (holding that the Convention focuses on "'*whether* a child should be returned to a country for custody proceedings and not *what* the outcome of those proceedings should be.'" (citation omitted)). Indeed, federal district courts ruling on petitions under the Convention do not make findings related to custody. *Monasky*, 589 U.S. at 72 ("It is the Convention's core premise that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence.") (citation modified); *see also Tsuruta v. Tsuruta*, 76 F.4th 1107, 1110 (8th Cir. 2023) ("The Hague Convention does not govern custody battles, instead the Hague Convention determines the proper forum for custody battles."); *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010) ("With a few narrow exceptions, the court must return the abducted child to [their] country of habitual residence so that the courts of *that* country can determine custody.").

### III.   LEGAL STANDARD

To determine whether a petitioner establishes a prima facie case for return under the Convention, a court must make four findings: (1) that the child was under the age of sixteen when the removal or retention at issue took place;[3] (2) that the state in which the child was habitually resident immediately prior to the removal or retention is where Petitioner resides; (3) that the removal or retention breached the rights of custody attributed to the petitioner under

---

[3] The Convention ceases to apply when a child attains the age of 16 years. Convention, art. 4.

ORDER ON PETITION FOR RETURN OF CHILD – 4

the law of the state of habitual residence; and (4) that the petitioner was exercising those rights at the time of the removal or retention. 22 U.S.C. § 9003(e)(1); 42 U.S.C. § 11603(e)(1); Convention arts. 3–4; *see Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001), *abrogated on other grounds by Monasky*, 589 U.S. 68. Petitioner must establish all four findings by a preponderance of the evidence. Convention arts. 3–4; 22 U.S.C. § 9003(e)(1); 42 U.S.C. § 11603(e)(1). If a prima facie case is established, then the court must order the prompt return of the child, unless the respondent can establish one of the narrow affirmative defenses enumerated in the Convention. Convention, arts. 12–13, 20; *Von Kennel Gaudin v. Remis,* 282 F.3d 1178, 1182 (9th Cir. 2002).

Relevant to this Petition, Article 13(b) of the Convention contains an exception to mandatory return that applies when a respondent can show that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The grave-risk inquiry is "concerned only with the degree of harm that could occur in the immediate future." *Gaudin v. Remis*, 415 F.3d 1028, 1037 (9th Cir. 2005), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666 (2022). The Ninth Circuit has recognized that the grave risk exception is "narrowly drawn" and "is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Cuellar v. Joyce* 596 F.3d at 509 (citations omitted). Even when the respondent establishes that a grave risk of harm exists, the court may still order the child's return if it determines there are ameliorative measures that would "allow both the return of the child[] to [his or her] home country and [the child's] protection from harm." *Gaudin*, 415 F.3d at 1035 (citation omitted). ICARA requires that a respondent must establish the Article 13(b) grave risk defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

ORDER ON PETITION FOR RETURN OF CHILD – 5

Article 20 of the Convention contains another exception to mandatory return that applies if the return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." A respondent bears the burden of proving this defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

Finally, the best interests of the child is *not* a defense in cases brought pursuant to the Hague Convention. *See* Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986) ("Public Notice 957").

## IV.    FINDINGS OF FACT

The Court's factual findings are based in part on the credibility determinations made during the hearing. To the extent any finding of fact includes conclusions of law, it is deemed a conclusion of law, and vice versa.

**A.    The Parties**

1.    Petitioner and Respondent are husband and wife and the biological parents of E.M.M. Dkt. No. 84 ¶ 7.

2.    Petitioner is a natural-born citizen of the United States who served in the United States Army between February 2014 and May 2020. *Id.* ¶5.

3.    Respondent is a natural-born citizen of the United States who served in the United States Air Force between January 2019 and January 2023. *Id.* ¶ 6.

4.    Petitioner currently resides in Misawa, Japan, while Respondent currently resides in Bellingham, Washington. *Id.* ¶¶ 5, 6.

5.    Neither Petitioner nor Respondent is an active, enlisted U.S. military servicemember. *Id.* ¶ 12.

ORDER ON PETITION FOR RETURN OF CHILD – 6

**B.      Relationship Background**

6.      Petitioner and Respondent met in May 2022 while working at Al Udeid Air Base in Doha, Qatar. *Id.* ¶ 24. They became romantically involved shortly thereafter. *Id.*

7.      In December 2022, the Parties visited Respondent's brother and their nieces in Japan and enjoyed the food, culture, and cleanliness of the country. *Id.* ¶¶ 36, 39.

8.      Upon returning to the United States, the Parties decided to move together to Sacramento, California, to be near Petitioner's family. *Id.* ¶ 25. They stayed there for approximately six months. *Id.* ¶ 26.

9.      The Parties then agreed to move to Aurora, Colorado, because Respondent had been offered a job there. *Id.* ¶¶ 27–29.

10.      On September 15, 2023, Petitioner and Respondent married in Arapahoe County, Colorado. *Id.* ¶ 8.

11.      In November 2023, E.M.M., a natural-born citizen of the United States, was born in Aurora, Colorado. *Id.* ¶¶ 7, 9.

**C.      Decision to Move to Japan**

12.      In Colorado, Petitioner worked as a system administrator for a private company. *Id.* ¶ 33. Respondent worked as a contract cybersecurity engineer for Raytheon. *Id.* ¶ 34.

13.      Respondent initially liked her position, but she later described the work environment as toxic. *Id.* ¶ 35.

14.      Due to turmoil in Respondent's job, on multiple occasions, the Parties discussed moving to Japan. Dkt. No. 84-2 ¶ 1.

15.      The Parties discussed moving to Japan because they wanted a healthy future for their daughter, had looked at schooling, and read statistics on child education in Japan, which ranked high. Dkt. No. 72 (Hearing Transcript) at 19:18–20:1.

16.     Both Petitioner and Respondent applied for jobs in Japan. Dkt. No. 72 at 22:2–21, 119:24–120:15; Exs. P-67, P-69.

17.     Respondent wanted to stay in her job until March 2025, so that she would not have to pay back a sign-on bonus. Dkt. No. 84-2 ¶ 3. She conditioned her approval to move to Japan on leaving her job after that time. *Id*.

18.     On September 12, 2024, Petitioner received an offer letter for a position in Misawa, Japan. Dkt. No. 84 ¶ 43.

19.     Although the Parties anticipated that it would take several months to actually move overseas, things moved much faster than they anticipated after Petitioner received his job offer. Dkt. No. 84-2 ¶¶ 4, 5.

20.     Respondent initially wanted to remain in the United States with E.M.M. through the March 2025 bonus pay-back period. *Id*. ¶ 6. Petitioner disagreed, such that Respondent felt that Petitioner was accusing her of splitting up the family. *Id*. ¶ 7.

21.     To keep the peace, Respondent supported the move to Japan earlier than March 2025. *Id*. ¶ 7.

22.     In anticipation of the move, the Parties sold most of their furniture and shipped their remaining items to Japan. Dkt. No. 84 ¶¶ 44, 45. The Parties further vaccinated and quarantined their pets for import to Japan and paid for Respondent's brother's airfare and hotel so he could assist them in importing their pets to Japan. *Id*. ¶¶ 46, 47, 52, 53.

**D.      Move to Japan**

23.     On January 6, 2025, the Petitioner, Respondent, and E.M.M. relocated to Misawa, Japan. *Id*. ¶ 61.

24.     The Parties chose northern Japan because Respondent loves skiing and wanted to teach E.M.M. how to ski; northern Japan had mountains and hiking which the Parties both

ORDER ON PETITION FOR RETURN OF CHILD – 8

enjoyed. Dkt. No. 72 at 21:12–17; Dkt. No. 84 ¶ 40.The parties discussed that while they were located in Japan, they wanted to expose E.M.M. to the Japanese language, culture, and country, seeing it as a good developmental step for her, as she was then the primary age to learn Japanese. Dkt. No. 84 ¶¶ 49, 69.

25. The Parties eventually wanted E.M.M. to be immersed in Italian, French, and Mexican cultures, and to learn to speak Italian and French. *Id.* ¶¶ 49, 50, 70.

26. Petitioner signed a one-year lease for a rental house on Misawa Air Base in Japan. *Id.* ¶ 62; Ex. P-50.

27. Respondent testified that the Parties went to Japan thinking it would possibly be a good location and that they would reevaluate the decision at the one-year renewal. Dkt. No. 73 at 123:6–9.

28. The Parties purchased items with which to furnish their home in Japan, including a refrigerator, washer/dryer combo unit, stove, dining-room table, mattress, bed frame, couch, carpets, and blinds. Dkt. No. 84 ¶¶ 77–79.

29. After relocating to Japan, the Parties purchased two vehicles.. Dkt. No. 84 ¶ 64, Exs. P-32, P-33.

30. Respondent served as a volunteer track coach in Japan. *Id.* ¶ 88.

31. Respondent continued to apply for jobs while residing in Japan, including to one at Misawa Air Force Base the week before leaving for Washington. *Id.* ¶¶ 89, 90; Dkt. No. 72 at 194:13–16.

**E.    Care of E.M.M.**

32. In Colorado, both Petitioner and Respondent took care of E.M.M. Dkt. No. 72 at 17:16–18; *see also* Ex. R-10.

ORDER ON PETITION FOR RETURN OF CHILD – 9

33. Respondent always considered herself the primary caretaker of E.M.M. Dkt. No. 72 at 130:18–19, 195:13–196:4.

34. In Japan, Respondent was the full-time caregiver for E.M.M. *Id.* at 130:16–21.

35. The parties researched and chose a doctor in Tokyo as the primary-care physician for E.M.M. because they believed it would provide the best medical care for their daughter and themselves. Dkt. No. 84 ¶ 82. Petitioner and Respondent jointly selected a doctor in Tokyo for E.M.M.'s medical care. *Id.* ¶ 83.

36. When E.M.M. was sick, Respondent would care for her and take her to her doctors' appointments. Dkt. No. 72 at 195:19–25. Respondent was the parent who changed E.M.M.'s diapers most of the time. *Id.* at 196:1–2.

37. E.M.M. attended daycare in Japan. Dkt. No. 84 ¶ 71.

38. Respondent would take E.M.M. to a toddler playgroup, and Petitioner would sometimes "try to catch up" during lunchtime. Dkt. No. 72 at 53:7–12.

**F.     Disintegration of the Marriage**

39. On May 1, 2025, Respondent asked for a divorce and started sleeping in another bedroom in the home. Dkt. No. 72 at 68:5–7, 113:11–20, 178:23–179:14; Dkt. No. 73 at 114:21–22.

40. On May 19, 2025, Petitioner told Respondent he wanted her gone from the home within one month. Dkt. No. 72 at 196:16–19.

41. Sarah Boss, Respondent's therapist, wrote the following note in a therapy session with the Respondent: "Japan, loved Japan. Back from five-month trip. Supposed to be there years. Lots went wrong," which corresponds to the time Respondent and E.M.M. were in Japan in 2025. Dkt. No. 84 ¶¶ 116, 121, 122.

ORDER ON PETITION FOR RETURN OF CHILD – 10

42.     Starting at the beginning of May 2025, Petitioner and Respondent maintained an agreement to take turns so they would have equal time with E.M.M. until they had a better arrangement (i.e., Petitioner would take E.M.M. for one day and Respondent would take her for one day). Dkt. No. 73 at 116:7–10.

**G.     Removal of E.M.M.**

43.     On or about May 21, 2025, Respondent took E.M.M. to Tokyo for a doctor's appointment.. Dkt. No. 72 at 67:2–5.

44.     On May 22, 2025, Respondent removed E.M.M. to Washington. Dkt. No. 84 ¶ 10.

45.     E.M.M. was 18 months old when she was removed to Washington. *Id.*

46.     If the Court determines Japan is the habitual residence, then Respondent agrees that Petitioner had custody rights and was exercising those rights at the time of removal. Dkt. No. 73 at 209:14–16; Dkt. No. 84 ¶ 11.

**H.     Japanese Law Regarding Custody and Divorce[4]**

47.     Respondent presented uncontested testimony from an expert on Japanese law, Sahoko Awakawa Kono.

48.     Ms. Awakawa is an attorney with 17 years of experience in the area of family law with a specialty in divorce and custody issues, a member of the Hague Convention Working Group of the Japanese Bar Association, and has been listed as a Hague Convention Lawyer by

---

[4] The facts stated in this section are based upon the uncontested testimony of Respondent's expert on Japanese law. *See* Dkt. No. 73 (sealed) at 201–20. Petitioner was going to present testimony in his case-in-chief through a Japanese expert that he had rights of custody at the time of abduction, but he did not do so because the Parties stipulated to that fact. *Id.* at 207:7–10. Petitioner also chose not to cross examine the expert or call a rebuttal expert witness. *Id.* at 220:22–221:1, 223:23–224:6.

Petitioner did not object to the qualification of Respondent's witness as an expert in the Japanese laws regarding Hague Convention and family law. Dkt. No. 73 at 204:24–205:1.

ORDER ON PETITION FOR RETURN OF CHILD – 11

the Japanese Bar Association since 2014. Ex. R-9. She has provided consultations in Hague cases to the "left-behind parent." Dkt. No. 73 at 204:1–19.

49.     When applying Japanese law to custody disputes, Japanese law treats marriages performed in foreign countries the same as marriages performed in Japan. Dkt. No. 73 at 212:22–213:22. The marriage does not need to be registered in Japan to be recognized under Japanese law. *Id.* at 213:20–22; Dkt. No. 84 ¶¶ 127–128.

50.     Jurisdiction may be established in Japanese courts in several situations, including when the respondent resides in Japan or when the couple's last habitual residence was in Japan and the petitioner currently resides there. Dkt. No. 73 at 214:13–215:16, Dkt. No. 84 ¶¶ 131–132.

51.     Under Japanese law, if the petitioner resides in Japan and the couple's last common residence was in Japan, jurisdiction would be established. Dkt. No. 73 at 216:6–8, Dkt. No. 84 ¶ 134.

52.     Under Japanese law, jurisdiction in this case could exist because the couple's last common address was in Japan. Dkt. No. 73 at 221:20–23; Dkt. No. 84 ¶ 136.

53.     Under Japanese law, when a couple is married, both parents have joint parental rights. Dkt. No. 73 at 213:16–17; Dkt. No. 84 ¶ 126.

54.     Under Japanese law, parental rights include the rights of custody, right to take care of economic decisions related to a child, and right to decide where a child should live. Dkt. No. 73 at 208:19–24.

55.     Under Japanese law, if parents separate with no agreement regarding custody and one parent takes the child, the "left-behind parent" must apply for injunctive relief to obtain custody of the child, a process which takes an average of one month. *Id.* at 210:17–211:4.

ORDER ON PETITION FOR RETURN OF CHILD – 12

56.    The Japanese court will consider which parent was the primary custodian of the child from birth until removal which, for a two-year-old child, looks to who provides the actual daily care of the child (*i.e.*, who wakes up the child, who feeds the child, who bathes the child, who takes the child to daycare, who communicates with the daycare provider, and who takes the child to the hospital). *Id.* at 211:10–17, 212:22–213:10.

57.    In the case of an illegal removal, the Japanese court will also look to see whether the removal was made peacefully—that is, whether force had to use to remove the child or the child was resisting or objecting to being removed. *Id.* at 211:17–22.

58.    Under Japanese law, the primary custodian will be given custody. *Id.* at 211:10–12.

59.    Under Japanese law, if the left-behind parent is not the primary custodian, the left-behind parent will lose the case. *Id.* at 211:12–13.

60.    Under Japanese law, a left-behind parent may apply for custody via injunctive relief, regardless of whether a divorce case is pending in court. Dkt. No. 73 at 223:8–11, Dkt. No. 84 ¶ 139.

## V.    CONCLUSIONS OF LAW

The Court will now turn to the elements of Petitioner's prima facie case.

### A.    Removal Date/Age of Child

The Parties do not dispute that Respondent removed E.M.M. from Japan on May 22, 2025, and that E.M.M. was under the age of 16 at the time of removal. Dkt. No. 84 ¶ 10.

### B.    Habitual Residence

The parties dispute whether E.M.M. had a habitual residence in Japan. The term "habitual residence" was intentionally left undefined in the Convention. *Holder*, 392 F.3d at 1015. However, the Supreme Court has held that "a child's habitual residence depends on the totality

ORDER ON PETITION FOR RETURN OF CHILD – 13

of the circumstances specific to the case." *Monasky*, 589 U.S. at 71. An actual agreement between the parents is not necessary to establish an infant's habitual residence. *Id.* Instead, determining a child's habitual residence is a "fact-driven inquiry" *Id.* at 78. The inquiry "should not be glossed with legal concepts." *Id.* at 79–80 (citation omitted). Regardless, "the bottom line [is]: There are no categorical requirements for establishing a child's habitual residence . . . ." *Id.* at 80–81.

For older children capable of acclimating to their surroundings, facts indicating acclimatization will be highly relevant. *Id.* at 78. However, for children too young or otherwise unable to acclimate and who depend on their parents as caregivers, "the intentions and circumstances of caregiving parents are relevant considerations." *Id.* "[A] wide range of facts other than an actual agreement, including those indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence has the quality of being 'habitual.'" *Id.* at 81. Here, E.M.M. was only 18 months old at the time of removal. Dkt. No. 84 ¶ 10. Therefore, the Court's inquiry will focus on the intentions and circumstances of the caregiving parents.

While there was not agreement on *when* the Parties would move to Japan, both Parties agreed that the next phase of their life for their family would be in Japan. *See supra* Section IV.C, D; Dkt. No. 84-2 ¶ 7 (Respondent "supported the move to Japan"). This was evidenced by actions they took both before and after the move. For example, the Parties sold most of their furniture and shipped their remaining items to Japan, including going through extensive preparation to be able to move their pets with them to Japan. After arriving in Japan, they rented an apartment for one year and purchased home furnishings, as well as two cars—a significant investment of money. The Parties enrolled E.M.M. in daycare. Further, Respondent testified that the Parties' intent was to re-evaluate their residence in Japan at the one-year lease renewal,

conceding that they intended to stay for at least one year. Respondent stipulates that she had been applying for jobs in Japan as recently as the week before she removed E.M.M. to Washington. Finally, Respondent's therapist's notes indicate that Respondent had acknowledged an intent to remain in Japan for longer than she actually did. Taken together, all of these actions indicate both Petitioner and Respondent's intent to remain in Japan for a minimum of at least one year, and most likely longer than that.

Therefore, the Court finds that the habitual residence of E.M.M. at the time of her removal (i.e., a little less than five months after moving to Japan) was Japan, where Petitioner resides.

**C.    Breach of Custody Rights**

Next, the Court must determine whether E.M.M.'s removal was "in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal[.]" Convention art. 3. This element of the prima facie case requires two findings: (1) that a petitioner had rights of custody; and (2) that those rights to custody were breached.

The Convention defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention art. 5(a). "Rights of custody" may arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." *Id.* art. 3.

> In ascertaining whether there has been a wrongful removal or retention within the meaning of [the Convention], the [Court] may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

ORDER ON PETITION FOR RETURN OF CHILD – 15

*Id.* art. 14. Therefore, in determining whether Respondent's action was in breach of Petitioner's rights of custody, the Court looks to the law of the state of E.M.M.'s habitual residence—i.e., Japan.[5] *See Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir. 1999), *as amended on denial of reh'g and reh'g en banc* (Sept. 14, 1999).

### 1.    Whether Petitioner Had Rights of Custody

The Parties stipulated that Petitioner had rights of custody at the time of E.M.M.'s removal from Japan. Dkt. No. 73 at 209:14–16. Dkt. No, 84 ¶ 11. Therefore, the Court finds that Petitioner had rights of custody under Japanese law at the time Respondent removed E.M.M. from Japan.

Petitioner seems to argue that the inquiry for this factor ends with this finding. Petitioner cites *Furnes v. Reeves*, 362 F.3d 702 (11th Cir. 2004), for the unremarkable proposition that "'if Plaintiff [ ] shares with Defendant [ ] a joint right to determine Jessica's place of residence, he has a right of custody under the Hague Convention.'" Dkt. No. 88 at 3 (quoting *Furnes*, 362 F.3d at 714–15) (alterations in original). But Respondent does not dispute that Petitioner had a right of custody under the Hague Convention and, indeed, stipulated to that fact.

And the inquiry does not end there. Article 3 of the Convention provides, "The removal or the retention of a child is to be considered wrongful where – *a)* it is *in breach of* rights of custody attributed to a person . . . ." (emphasis added). Petitioner's position reads out the words "in breach of," which are plainly stated in Article 3. It is true that one must have rights of custody as a prerequisite. After all, if one did not have custody rights, then such rights could not have been breached. But whether those rights were breached is a critical and stated component of this element, to which the Court now turns.

---

[5] Only evidence as to Japanese law was presented at the hearing (*see generally* Dkt. Nos. 72, 73), and both Parties only discuss Japanese law in their stipulations and briefing (*see generally* Dkt. Nos. 84, 84-2, 86-1).

**2.    Whether Respondent Breached Petitioner's Rights of Custody**

Under Japanese law, with respect to married couples, both parents have joint parental rights, one of which is deciding where a child should live. However, based on the uncontested testimony of Ms. Awakawa, the Court finds that under Japanese law, when married parents separate, the primary custodian of the child will be awarded custody.[6] The primary custodian is the parent who provides the actual daily care of the child from birth until removal. Further, if the child was alleged to have been removed illegally, the Japanese court will examine whether the child objected to the removal. If the parent who is the primary custodian from birth until the removal takes physical custody of a child and removes the child from Japan without agreement or permission of the other parent, and the child does not object, the removing parent does not infringe the custody rights of the other, left-behind parent.

In this case, it is uncontested that Respondent asked Petitioner for a divorce on May 1, 2025. Respondent then moved into the home office for all intents and purposes, and Petitioner asked Respondent in mid-May to leave their home within the next month. Both Parties testified that, in fact, they had made arrangements on how to share custody of E.M.M. for the month of May 2025. These facts are clearly indicative of a fractured marriage. Therefore, the Court finds it uncontested that the Parties were separated by May 1, 2025.

Petitioner testified that from E.M.M.'s birth until Petitioner and Respondent moved to Japan, both Parties took care of E.M.M., but Respondent testified that she always considered herself the primary caregiver for their daughter. It is also undisputed that, starting in May 2025,

---

[6] At the hearing, Petitioner's Counsel stated that he was being "ambush[ed]" with this topic. Dkt. No. 73 at 212:21. However, Respondent raised the issue of custody rights when parents are separated in her Trial Brief. *See* Dkt. No. 60 at 12. Moreover, although the Court informed Petitioner's Counsel that he could cross-examine the witness on this topic when it was his turn (Dkt. No. 73 at 212:14–18), he chose not to ask any questions on cross examination. *Id.* at 221:1.

until Respondent removed E.M.M. from Misawa, the Parties agreed to split custody of E.M.M. evenly. For these periods, the Court finds that the Parties shared fairly equally the responsibilities for caring for E.M.M.

However, between the time the Parties moved to Japan and the beginning of May 2025, while Petitioner participated in the care of E.M.M., Respondent testified that she was the primary caregiver for E.M.M., and Petitioner did not challenge that testimony in any of his questioning. The Court finds that Respondent was clearly the primary custodian of E.M.M. for the majority of the time that the couple was in Japan, as would be expected given that Petitioner was working full-time while Respondent was still looking for employment. For example, Respondent was the parent who took E.M.M. to play groups and to medical appointments in Tokyo. Given the totality of the circumstances, the Court finds that Respondent was the primary custodian of E.M.M. under Japanese law.

Finally, no evidence was presented that Respondent used any force to remove E.M.M., or that E.M.M. objected in any way to being removed from Japan.

Given these facts, in combination with the Court's finding that Respondent was the primary custodian of E.M.M. and Ms. Awakawa's testimony about Japanese law, the Court finds that a Japanese court would deny Petitioner's application for injunctive relief and custody if he were to file such a petition (there is no evidence that he took this step). The Court further finds that Petitioner fails to establish by a preponderance of the evidence that E.M.M.'s removal breached Petitioner's rights of custody under the law of the habitual residence—i.e., Japan.

**D.   Exercise of Custody Rights**

The Parties agree that, if Japan is found to have been the child's habitual residence, Petitioner had custody rights and was exercising those custody rights at the time of E.M.M.'s removal from Japan to Washington.

ORDER ON PETITION FOR RETURN OF CHILD – 18

## VI.    CONCLUSION

For the reasons stated in this Order, the Court finds that even though Petitioner was exercising his custody rights, E.M.M. was not removed in breach of those rights. Therefore, the Court finds that Petitioner has not established a prima facie case for the return of E.M.M. to Japan. Accordingly, the Petition (Dkt. No. 1) is DENIED.[7]

Dated this 13th day of May, 2026.

Tana Lin
United States District Judge

---

[7] Having found that Petitioner has not established a prima facie case for return, the Court need not reach the defenses raised by Respondent.

ORDER ON PETITION FOR RETURN OF CHILD – 19